May it please the Court, Harker Rhodes on behalf of Appellant Carl Gordon. From 2008 until 2015, Carl Gordon was categorically excluded by Virginia prison policy from treatment for his Hepatitis C. For the first six years from 2008 to 2014, he was categorically excluded from treatment because he was parole eligible on an annual basis. And then for an additional year, he was categorically excluded from treatment because the defendants here suspended all care and treatment for Hepatitis C across the entire Virginia prison system. Now defendants make little attempt to defend those unconstitutional policies on their merits. Instead, Schilling and Aminette primarily argue that they should escape liability for implementing those unconstitutional policies because they claim they either were not subjectively aware that Gordon himself was being excluded from Hepatitis C treatment by those policies, or alternatively they claim they were not personally involved in the decision to deny him treatment. Respectfully, we submit that those arguments are belied by the record, or at the very least that they raise disputed issues of material fact that must be decided by a jury at trial and not by the district court at summary judgment. As the Seventh Circuit held on strikingly similar facts in Roe v. Elyea, a jury could readily conclude that by adopting policies that categorically excluded inmates from needed medical treatment, Schilling and Aminette demonstrated deliberate indifference to Gordon's serious medical needs and thereby violated the Eighth Amendment. To begin with the subjective awareness issue or the subjective indifference test, Schilling and Aminette argue that the subjective indifference requirement cannot be met here because they claim they did not specifically know that Gordon himself needed medical treatment for his Hepatitis C and was being excluded for that treatment by their prison policies. But the Eighth Amendment standard does not require showing that a prison official knows which specific inmate will be harmed by his actions. Instead, as the United States Supreme Court said in Farmer, it requires showing only that the prison official subjectively, quote, knows of and disregards an excessive risk to inmate health or safety, end quotation. It doesn't require knowledge that a specific inmate will be harmed by those policies. And that's for good reason. Under Schilling and Aminette's interpretation, the governor of Virginia could declare on a categorical basis that prisons simply would not treat cancer or would not treat broken legs anymore. And as long as the governor of Virginia avoided knowing which specific prisoners in his prisons had cancer or had a broken leg, under defendant's theory, there would be no Eighth Amendment violation. We submit there is no court that adopts that extreme view of the Eighth Amendment test and that Supreme Court cases like Farmer versus Brennan and this court's decisions like Eco versus Shreve reject that understanding of the Eighth Amendment. In addition, of course, there's the Seventh Circuit's decision in Roe versus Elyea, which we submit does set out the correct standard under the Supreme Court's precedent in these specific circumstances. As the Seventh Circuit said in Roe versus Elyea, the subjective and different standard is met whereas here, prison officials know that prisoners will be categorically excluded from treatment for non-medical reasons. Nothing in the Elyea decision suggests that the defendant there, Dr. Elyea, who was like Schilling and like Amanet, a superior prison official, was subjectively aware that the particular plaintiff in that case, Richard Roe, was being excluded from treatment because of the policies that Dr. Elyea implemented. As far as subjective knowledge goes, the decision in Elyea appears to be on all fours with the Seventh Circuit said, because Elyea adopted and enforced a policy that categorically excluded Roe from treatment, even though he didn't know anything about Roe specifically, he could still be held liable and had still violated the Eighth Amendment's subjective and different standard, or at least a jury could reasonably so find. And of course, that's all that we're asking for here. What about the period between 2014 and 15 where they say that they determined, in terms of your argument, of non-medical reason, for those, you said, the broader concept of denial. But here they're saying they found that their protocol of treatment turned out, in their understanding, is not good and we need to revamp. So they discontinue it to redo it. What about that period? Don't they assert a medical reason for that? Your Honor, two points in response. First, they certainly do assert a medical reason for that. But it's our contention that a jury could reasonably find that Dr. Amanet's decision, like Dr. Elyea's decision in Roe versus Elyea, was in fact motivated by a non-medical reason, namely administrative convenience. And second, the key piece of evidence, I think, to support that is at JA 102, in Dr. Amanet's own declaration, where he says, I do not make medical judgments about prisoners. I don't make medical decisions about particular prisoners in the Virginia health system. In other words, when Amanet adopted that policy, he wasn't saying, I think that Gordon himself and other individual prisoners like him shouldn't receive pegulated interferon therapy. Instead, he was adopting a broad-based policy that applied across the entire Virginia prison system and that prevented the actual treating physicians, the physicians who were seeing for Gordon whatever treatment they thought were in his best interest. To be clear, we would not have a claim here if the treating physician who actually saw Gordon in prison said, I've looked at your case, and I don't think that pegulated interferon therapy would be good for you. But that's not what happened here. Amanet's decision was not based on an individualized medical judgment about Gordon. Instead, what Schilling and Amanet try to say is that they could reasonably have relied on the judgment of those prison doctors who didn't attempt to order any further treatment for Gordon. But the problem with that argument, Your Honor, is that the policies that Schilling and Amanet were enforcing, which applied to those prison doctors and which those prison doctors were bound by, actually prohibited those doctors from ordering the specific treatment at issue here. And so there was simply no medical judgment by the treating doctors to which Schilling and Amanet could have deferred. We think that's just like this court's decision in Eco, where this court said when there's no medical opinion by the actually treating personnel, then other personnel can't say they deferred to that medical opinion. And here, Schilling and Amanet adopted policies that prevented exactly that kind of medical judgment from taking place. Now, on the personal involvement issue, with respect to Schilling, we think his personal involvement here rests on two points. And we think that a jury could reasonably find that he was personally involved in the decision to deny Gordon treatment for two reasons. First, as the director of the health services unit in the Virginia Department of Corrections, Schilling was personally the official with the authority and the responsibility to review all practices and procedures within the Virginia prison health care system and to ensure that those practices and policies complied with federal law. Despite that authority and despite that obligation, Schilling took no action to revise the unconstitutional parole eligibility policy here. He took no action to make that policy comport with the Constitution for the entire period from 2008 until 2014. And then again, from 2014 to 2015, he took no action to make Dr. Amanet's general suspension conform with the Constitution by allowing for different medical decisions by the actual treating physicians. Second, the first category of personal involvement, then, is Schilling's personal decision not to revise the unconstitutional policies at issue. The second category of personal involvement, of course, is Schilling's own personal denial of the repeated grievances that Gordon brought, complaining about the fact that he was not receiving appropriate hepatitis C treatment. That, again, constitutes personal involvement by Schilling in the denial of treatment. As to Amanet, we again think that the personal involvement in the record is more than sufficient for a jury, when presented with these claims, to reasonably find that Dr. Amanet was personally involved in the denial of treatment. Again, that's on two bases. First, from March 13, when Dr. Amanet became the chief physician of the Virginia health care system in the prisons, he took no action for 11 months to revise the unconstitutional parole eligibility policy. It's clear that he had the authority to do that. He did eventually do that in February 2014. But for those first 11 months, he took no action. And we think that a jury could find him liable for that inaction. Second, and much more markedly, of course, Amanet was the chief physician who personally implemented the policy of suspending all hepatitis C care and treatment in the Virginia system for an entire year, from February 2014 until February 2015. And that, on its face, we submit, constitutes personal involvement in the denial of treatment, because it was Dr. Amanet who personally adopted the policy that categorically excluded Gordon from treatment from February 2014 to February 2015. And it's quite clear from the record that, in fact, that suspension of treatment did affect Mr. Gordon himself, because that suspension of treatment is what Schilling cites in his grievance response at JA 138 to say that, no, we can't give you treatment for hepatitis C, because the hepatitis C guidelines have been suspended. Now, with respect to the remaining issues, Your Honor, first, there's the official capacity question that the defendants raise. On that, we think, from the Supreme Court's decision in Lewis v. Clark, which follows on its previous decisions in Hafer v. Mello, Kentucky v. Graham, and similar cases, the question for a personal capacity suit versus an official capacity suit is not the capacity in which the officer acted, in other words, by adopting an official policy. Instead, it's the capacity in which the plaintiff seeks relief, which here is the individual capacity. Gordon is seeking damages from Schilling and from Ammonet personally, and he's not seeking relief from the state of Virginia in any way. With respect to the qualified immunity issue, we submit that that can be left to the district court to decide on remand. However, if this court is inclined to address the issue, we think that the Seventh Circuit's decision in Roe v. Elyea explains exactly why, under, again, strikingly similar facts, qualified immunity is not warranted here. And defendants say nothing in their brief to respond to the qualified immunity analysis in Roe v. Elyea, which, again, we think is directly on point. Finally, with respect to the additional issues that the court asked us to brief, the court asked us to respond to whether Schilling, in fact, had the authority to make an exception or to revise the Virginia treatment guidelines. We think that question is answered by the Virginia Department of Corrections operating procedures that we cite in our brief, which say that the health services director shall annually review and revise all practices and procedures in the Virginia prison health care system. Defendants don't disagree with the text of those operating procedures. Their only response is to say that those procedures aren't in evidence, but, of course, they don't respond in any way to the fact that those procedures are documents of public record, and that are subject to judicial notice. Exactly, Judge King. And finally, in any event, we submit that even if Schilling didn't have the authority to revise those policies himself, which, again, the prison procedures say that he did, but even if he didn't, state law can't be a defense to the federal law cause of action under Section 1983 for the violation of federal constitutional rights. The Supremacy Clause guarantees. They can't amend the Constitution. Exactly, Judge King. I'm happy to respond to any further questions. The only constitutional provision that you rely on is the Eighth Amendment. That's correct, Your Honor. Cruel and unusual punishment? Excuse me, Your Honor? Which part of the Eighth Amendment? The Cruel and Unusual Punishment Clause. Yes, Your Honor. If there are no further questions, we ask that the Court reverse and amend. You say you're satisfied. You'd be satisfied if we thought there were sufficient allegations here. If we sent it back but left the qualified immunity issue open for the District Court to deal with, they could still get that. That's correct, Your Honor. We think both avenues are open to this Court. We think this Court could address it as a matter of law and simply follow the Seventh Circuit in holding that, again, on strikingly similar facts, qualified immunity is not warranted. However, I recognize that this Court's usual practice is to allow the District Court to address the issue in the first instance, and the District Court never would. They would generally review things. Exactly. Rather than take a purge view. That's correct, Your Honor. Thank you very much. Thank you, Mr. Roland. Ms. O'Shea? Yes, sir. May it please the Court, Margaret O'Shea from the Virginia Office of the Attorney General, on behalf of your apolice, Mr. Schilling and Dr. Amanet. At issue in this case is whether the District Court erred by determining, on the basis of the factual record before it, that there was no triable issue of fact with respect to whether these two prison administrators, who were not directly involved in this inmate's care, could nonetheless be subjected to liability under the Eighth Amendment. As to Mr. Schilling, he is not a physician. He does have general oversight over DOC policies, but he was never given any information relative to those policies or relative to the grievances that came before him that would have alerted him to the fact that there was some gross inadequacy in the medical care that was being provided to this plaintiff that meant that he should step in. With respect to Dr. Amanet, he is a physician, but he was not drugged. He had the hepatitis C virus. Yes, sir. And you all said he couldn't be treated for years? He did not. Because he was eligible for parole, because they reviewed it every year or so, right? That's not actually in the record, Your Honor. What's accurate? What is in the record is that he was parole eligible, yes. He's parole eligible, and that made him ineligible for treatment. That is a step that's not in the record. Mr. Gordon produced no evidence to the District Court that would prove that inference, that the reason he wasn't being provided with hepatitis C treatments was because he was parole eligible. It's not documented in his grievances. It's not documented in his medical records. There's nothing before the court except his own speculation, which is not evidence, that that's the reason he wasn't getting treated. But the policy is in evidence. It existed. Correct. And there are multiple disqualifying criteria in the policy, any number of which could have been applied to him. But that one does exist, correct? Correct. It did. And is it also undisputed that he was parole eligible? That is correct. So, therefore, he falls under the policy that did exist, which prevented him from getting treatment for hepatitis C. But there may have been other reasons he wasn't getting treatment for hepatitis C. That was enough. That's definitely a substantial reason enough, isn't it? Well, but if he's trying to claim injury... Maybe you can prove another reason to the jury. If he's trying to claim injury that's causally related to a policy, he needs to show the And he didn't come forward with that evidence before the district court. And that's an element on which he wouldn't have gone in the first place. If he's got the hepatitis C virus... Correct. Presumably, he's going to be treated for it. It's a dangerous disease, right? It can cause, what, cirrhosis of the liver? Death? It can be. It can be. When you look to the introductory paragraph... And it wasn't treated. It wasn't treated. He didn't get medication for it. Pardon? He did not get medication. That is correct. All right. And for several years, and there's a policy that those suffering from that disorder are not eligible for treatment if they're parole eligible. That's correct. And other inmates, however, are also not eligible for treatment if their lab work, for example, doesn't meet certain criteria in the policy. So your defense is there's no nexus. Correct. Well, why wouldn't that just be a jury question? Because we came before the court. If there is a nexus, you admit there's a constitutional violation? No. I didn't think you would. Why not? Why wouldn't that be? Because there's no clearly established right to receive actual medication, curative medication for your hepatitis C, as opposed to monitoring and having a doctor check your labs and keep an eye on you basically to see whether or not the disease is progressing. This disease spontaneously resolves in a large percentage of the population that's infected with it. It's not like having your arm cut off and bleeding out in your cell. It is a disease that can be monitored, have lab work done to see if it is progressing to a level at which maybe curative treatment becomes required. And that's exactly what they did with this particular inmate. They monitored him. Wasn't there some evidence to the record that he was in the last stage of it or something? Not until after he filed this lawsuit. Pardon? That evidence didn't come out until after he filed this lawsuit. Is it in the record? It is. He introduced that. Well, the record's the record. It is, but we're looking to what these defendants... A lot of stuff comes out after the lawsuit's filed. It's called discovery. I understand, Your Honor. But if you're looking to what these defendants knew or could reasonably have known during a time period that's pertinent to the complaint, what they actually knew or what Mr. Schilling knew... Mr. Amanet didn't know any of it. What Mr. Schilling knew was that he was receiving monitoring by a physician. He knew that he had received lab testing and that the result of his labs were actually getting better year to year to year. And he knew that because that was contained in the grievances that Mr. Schilling personally reviewed. But isn't there some expert testimony that enzyme flux realities can be presented and those alone cannot be determined if he's necessarily getting better? There could be that expert testimony, but it's not present in this case. In this case, when you look to what Mr. Schilling, who's not... He's not a doctor. He's an administrator. What he knew... It makes it even worse, really, here, because he's making a decision that broadly impacts whether someone is going to get treatment and is not a physician. He's not making the decision. I'm not sure that helps you. He's saying... He's making medical decisions. He says you can't be treated. No, he didn't. At no point does Mr. Schilling ever say that. In the responses to the grievance appeals, he repeatedly tells Mr. Gordon, this is up to your doctors at the facility. Talk to your doctors at the facility. They make decisions regarding your treatment. I don't. All right. If that's the case, then why would parole eligibility have anything to do with the treatment monitoring prognosis of a disease that's potentially lethal? Well, it doesn't affect monitoring. It gets monitoring regardless. Okay, but what... It affects referral to medication, and Dr. Amanat explained that. But what does parole eligibility have to do with those things? Dr. Amanat explained that in his affidavit. He said, if there's a chance somebody could be immediately released, so parole eligible with a potential release date, then they could be released from custody before they have finished the course of medications that are required. We're at the time. It's different now. 2019 is not 2004. But the medications at the time, you needed 12 to 24 months to complete the entire course of medications. If you stopped on the medications in the middle, your body would be resistant to them, and you couldn't get them in the future. So DOC is trying to protect the best interest of the inmates. We're not going to treat him at all if we can't give him the full treatment for 24 months or whatever it is. You need enough time left on your sentence so we can complete the treatment before we release you. It would be theoretically possible that he could be treated after being released. Oh, absolutely. Well, sure. Absolutely. And then there's no guarantee to be paroled at all. We've got plenty of cases that there's no right to parole. That is correct, Your Honor. But this is Virginia, right? I think the parole board actually has taken large strides on that in recent years. Oh, really? Virginia has a lot of cases where people will still undergo parole, stay in there a long time, and they come due to the nature of your offense, those things like that, and the nature of the offense will never change no matter what your good behavior is. I mean, you can't have it both ways. You come in here and defend these cases where people come with perfect incarceration records in terms of behavior, but it's still every year they get, oh, due to their nature, or we don't think you've been there long enough, and you keep on and on and on. Then you come here and say, whoa, you're eligible. Therefore, you're going to get out before that 24-month period comes with the treatment department. But it really has nothing to do with treatment. It doesn't. Eligibility. But Dr. Amonetz gave a medical justification for the policy. And like I said, it's different now, but because of the length of treatment that was required for those early medications, that was the justification for the policy. Why don't you help them post-release then like you do? Isn't that what about rehabilitation is? You monitor them. You make sure that they've got to come here and tell you what they did last week and give you a report. I'm just trying to get a job. I can't get a job. No, you need to come here and make sure you're there. But you can't give them the medicine they need to live. Why don't you help them take it? Your Honor. I'm serious about it. We can go back and – Why don't you help them take it post-incarceration so they can be the productive citizen and healthy citizen that we want them to be? Isn't that the theory of rehabilitation? Well, it is, and that's why they're different now. But when we're talking 2004, it was a different environment. The medications were different. The environment was that from a humanities standpoint, we won't help someone continue medication. They need to live, and we're going to not give it to them on the hope that they may get out before we need to give it to them. That's quite twisted, isn't it? As laid out in the justification for the policy, and that justification is in evidence, what the Department of Corrections was trying to do was identify those inmates who were best able and best needed to be helped by those medications immediately, and that is what they did with that policy. Oh, so it was triage. They were monitored. And there's no evidence in the record that if he— Was that triage? You know what triage is, right? Well, yes, Your Honor, I know what triage is. Okay, well, was that a triage move? No. The people who won't get out at all, let's get them in first. No, I think that what it was an attempt to do was a prioritization and an attempt to find the people who were the sickest to treat first. And that's what actually the current guidelines do, too. Oh, the sick is not parole-eligible. So that's what the guidelines were intended to do, but the parole-eligible meant— You see, now you're switching there to sickness. So what does the sickest have to do with whether or not I'm parole-eligible? It's two different reasons that you could have been disqualified for treatment under— But the first one would be enough to knock you out, even though you're sick. I'm parole-eligible, but I'm the sickest. Sorry. But as my co-counsel has taken the position—not co-counsel, excuse me—my opposing counsel has taken the position on this appeal, there could have been an exception to the policy of what had been asked for. He just said Mr. Schilling had the authority to authorize deviations and changes to the policy. If Mr. Schilling had that authorization, then the policy doesn't suffer from the defect that he's claiming. But the facts don't boil it. He certainly went on many years and didn't get the treatment, a known treatment. But the facts also show that he was being monitored, that his labs were being drawn, that he had access to medical care, and that his lab work was actually improving. How long has he been eligible for parole? I don't know. I don't want to speculate. That's not in the record? There's a letter in the record that he introduced indicating that he was eligible for parole and parole had been denied and he was deferred. When? I don't know when that letter is. It's in the record. It's part of the Joint Appendix. You should know the record. What's the date of it? I mean, I'm just trying to figure out how long it is that he's been denied treatments because he's eligible for parole. I don't know that he was ever denied treatment because he was eligible for parole. Well, he hadn't gotten any treatments. We know he's sick. We know he's been eligible for parole, and we know he hadn't gotten any treatments. We know that much. He was diagnosed in 2008. 2008. That's what we started with. Correct. And the letter in the record was 2002. So 11 years. 2002. It's JA-78. He was eligible. Correct. He was eligible for parole in 2002. Okay. But I would like to, if I could, Your Honors. My math is right. He went seven years without receiving it. Without receiving the medication. Seven years. But so did a lot of other inmates within the Department of Corrections. Seven years for a treatment that we know is almost 100% effective to prevent something that is a fatal disease. Currently, not been. Not been. I would like to, if I could, Your Honors, touch briefly on the idea of you made a policy. Therefore, you're going to be liable in your individual capacity for damages because of the policy. Because I believe that the ELIA decision that has been cited by counsel and relied upon so heavily in this appeal is infected with several errors, not the least of which is that it ignores controlling United States Supreme Court precedent on the context of individual liability when a policy has been challenged. That's what 1983 suit is all about. Oh, it is. Absolutely. We agree with that. We do. And we agree that just because you're in your official position when you do something, that doesn't insulate you from potential individual liability. Absolutely. That's the law. And we don't contest that. If the circumstances are right, you're entitled to qualified immunity. That is correct. And that's not been addressed here. But it will be because I will get to that shortly. Yes, Your Honor. Farmer and then Ashcroft v. Iqbal are the two cases that are not adequately accounted for in the ELIA case. Farmer was given lip service, but it said you have to have actual subjective indifference to a known risk of harm to the inmate. Farmer, aside from setting forward that general subjective deliberate indifference standard, also said the deliberate indifference standard that has been adopted in the context of municipal liability cases, Canton and Monel and those cases, the deliberate indifference standard for municipal liability cases does not apply to individual liability claims against prison officials because that is an objective standard. And that is important because so many of the cases that I've talked about, just your general involvement in policymaking leading to liability, those are municipal liability cases. The cases that talk about you were just involved in faulty training, you didn't train your officers enough, those are municipal liability cases. That objective standard, meaning you were just involved in the policy somehow, therefore you're liable, that was rejected explicitly in Farmer. And then when you turn to Ashcroft v. Iqbal, it's a case that's often cited but not often do courts delve into what the opinion was actually about. In Iqbal, you had a suspected terrorist who was detained after 9-11. He was released from custody. He then subsequently filed suit against the U.S. Attorney General and the FBI Director. And he said, he challenged, he sued those two defendants because they, quote, enacted unconstitutional policies that were discriminated against me on the basis of my race, ethnic origin, etc. So he sued the AG and the FBI Director because he said they created an unconstitutional policy. And at Iqbal, the United States Supreme Court said that didn't even cross the plausibility threshold. We didn't even get to discovery because just making a policy, being involved in the creation of a policy, is not enough to show sufficient personal involvement to trigger individual liability. Now, Iqbal is not even cited in the Seventh Circuit alia opinion, much less addressed or otherwise discussed. So I would submit to this court that that failure is glaring and sincerely calls into question the conclusions that were reached in that particular opinion. So you say that the Seventh Circuit case is wrong. Yes. Okay. And so you must implicitly acknowledge that if the Seventh Circuit case is right, you've got a problem. Not necessarily, because I think it's distinguishable on other grounds. And in Lya, what the Seventh Circuit said was, we have a policy here that basically is facially awful because it doesn't allow for any medical discretion at the part of the individuals who are implementing the policy. The named defendant was a doctor. And the doctor said, yeah, I knew that this wasn't basically in accord with the medical standard of care. Now, that evidence is not here before the court. My opposing counsel has taken the position that this policy is not blanket, that there could have been exceptions created at some point. And particularly with respect to Mr. Schilling, since he's not a doctor, a policy that deviates from the medical standard of care is not something that's appropriately imputable to him in terms of determining the level of his subjective indifference. So I think that the defendant, the party, the allegations, the evidence were different in Lya than what we have before the court here. Turning now to the question of qualified immunity, I would like to touch on that very briefly. I think it is important in the context of qualified immunity to remember the Supreme Court's recent pronouncement and that of this Court that you have to look at the case at an appropriate level of factual detail in accordance with the case when determining whether or not a right is clearly established. At the time of alleged misconduct in this case, there was no clearly established right to receive curative medication for hepatitis C. At the time of the alleged misconduct in this case, there was no clearly established right to receive free doctor's visits, which was what all the chronic care visit complaints were about, as opposed to just access to medical services. The case that I think is the most important on this point is the Adams v. Ferguson case, which this Court decided last year. And that was the case that arose out of the Jamal Mitchell situation at the Hampton Roads Regional Jail. And it came up on appeal to this Court with the question of the commissioner of the DBHDS, whether she was entitled to qualified immunity because she had failed to have policies and take steps and measures to ensure that mentally ill inmates were transferred from local jails or from corrections departments into a mental hospital, basically. And what this Court said was that unless the conduct of the official or supervisor automatically and alone, meaning per se, violates the Constitution, the official is entitled to qualified immunity. Because inmates who stay in the prison system, just the fact of being in the prison system, does not per se subject you to an excessive risk of health or safety. The commissioner was entitled to qualified immunity. Here, too, inmates with Hepatitis C who are being monitored by physicians at the institution and having routine laboratory work done are not per se being subjected to unconstitutional risk of harm. So for that reason, Defendant Schilling and Defendant Amonet are entitled to qualified immunity on those claims. I would note as well that the legal landscape has been evolving rapidly over the past 10 years, and courts in the First, Second, Eighth, and Eleventh Circuit have all recently affirmed grants of summary judgment in cases where Hepatitis C inmate claims that he was being unconstitutionally treated because he just received monitoring as opposed to being referred for medication. Do you think if they develop a policy that says no one with cancer can receive chemotherapy in prison, do you think that would implicate and involve any constitutional rights? It could as applied to the inmates. I agree there would probably be facial issues with that particular policy. What would be facially wrong with it? You said they don't have a right to treatment. That's what you just told us. You said they don't have a right to treatment, so what would be facially wrong with that? You don't get chemotherapy if you have cancer. This isn't cancer. This is hepatitis. I knew it. It wouldn't be hypothetical if it was exactly the case. Right? I understand. But the cancer and hepatitis C, it's potato, patata. You can't compare them. No, they're both. You die, perhaps. Not necessarily. Cancer, yeah, you will. Hepatitis, not necessarily. There are many people who survive cancer. What do you mean by not necessarily? The point is the risk to life is the same. It's the same risk. I mean, it's even worse because, unfortunately, there are many cancers that stage four, we can't do anything about them but help you and nurture you and let it be a dignified passage into the other side of transition to death. But here, the person is like it's a glass wall and just won't let go through it. Take the pills. Take the medicine. We know it's almost 100% curable. And you're saying no, parole eligible, you don't get it. It's something that seems to be just unbelievably inhumane about that. And that's what the Eighth Amendment is for, cruel and unusual. And it seems to be unusual to the human dignity and the life, even for prisoners, who are your wards. They're wards. They're like babies. Yes, they are. You know it is. They have a comity to bring suits and all those kind of things. They're wards of the state. Okay, they're wards because they did something wrong, but they're nonetheless wards. And you're saying you have a policy, you're eligible for parole, you don't get the medicine we know that can cure you and prevent you from dying. And you say there's no Eighth Amendment implication there at all. That's your position with us, right? Yes, because it's not just cruel and unusual. It's cruel and unusual punishment. There is a subjective element that must be established. Right, and so you think it has to be punishment if you're just gross? You can just grossly ignore all medical, and that would arise to punishment. Because you punctuated with facial expression and you punctuated punishment, like that's the sine qua non. But case law has defined it more than just I want to beat you up, I want to lock you up because you're already locked up. It's talking about it constitutes punishment when it is deliberate and gross in those kind of standards. So it's not just punishment as we say per se, but it's a point of denying life, extending medication that we know that is almost 100% effective. This is not rocket science. It's just about being humane to people. It's not rocket science, Your Honor, but it's also medical science. And there was a medical justification provided for the policy. Neither one of these defendants were ever given a reason to try and decide whether or not an exception to that policy should be made for this particular defendant. Who knows what might have happened if he had done so? They had grievances, didn't they? And the grievances didn't reference his parole and eligibility, or eligibility, excuse me, until 2015 where the guidelines were already being resolved. The grievances that were submitted in 2013 did not contain any indication he was receiving inappropriate monitoring or lab work or treatment from the facilities. There was nothing in that from which Mr. Schilling, who's not a doctor, would have known to second-guess the doctors. Mr. Amonet, Dr. Amonet, was never given that information at all. All he did was suspend... The doctors couldn't give it to him because he was parole eligible. You made that determination. No, that's not actually what this record reflects. The grievances that he submitted in 2013, the responses from Mr. Schilling say, talk to your doctor at the facility. It is the doctor at the facility who will decide your treatment course. Right, and those are things about monitoring, testing, what you're doing. But as to getting the medicine, you are not eligible. That is not what the grievance responses say. That is not evidence in this record. We're not left to the four corners of his grievance alone to see whether or not you enacted policies that substantially prevented him from getting medication. But if you're trying to decide whether those policies, as applied to this inmate, were unconstitutional, the knowledge of the officials is crucial. It's critical. And he knew that no one who's parole eligible would get it. I don't know that that's in the record either, frankly. But if you want to infer knowledge of the policy, then yes, that general knowledge was there. But you also have the justification for the policy from the medical providers that he had no reason to second-guess. Do you think money is enough for you? You want to save money. Would that be enough reason? If money was the reason. The cost involved. I'm sorry. Cost. Otherwise, if there was, hypothetically, would that be enough reason? No. And the Department of Corrections actually doesn't take cost into consideration. They provide treatment regardless. And it should be medical, which is based on whether or not the treatment necessary would cure the person. Well, it's based on the decisions of the medical individual. Which is whether or not it would cure you, right? Whether you'd be cured by it. That's the medical reason, right? Because that's what the Hippocratic Oath is, right? To cure people, if you can. I believe it's to first do no harm. Well, in surgery they do that a lot. You don't operate on somebody, you're going to do worse for them. But in terms of the field of medicine, the art is to cure. Correct? Correct. If it can be cured. And if it can't be cured, it's to monitor. You don't monitor something if you know it. It's like saying, okay, you have strep throat. We're going to monitor and see how much your throat is going to swell up instead of giving you penicillin. There is evidence in this record that for a large part of the population, hepatitis C self-dissolves. Okay. All right. Thank you, Counsel. Thank you, Your Honor. I appreciate it. And I appreciate the opportunity to come here. Well, thank you for your argument as well. We appreciate it very much. Counsel, Mr. Rhodes, you have some time. Thank you, Your Honor. Just a few points on rebuttal. I'd just like to begin by emphasizing again that this case is up here on the summary judgment standard. And I think that the argument today has illustrated that there are indeed a number of disputed issues of material fact that require this case to be returned to the district court for a jury trial. I'd just like to point out a few, I think, of the key issues here. Well, if it's returned just on the disputed facts, the district courts still have to get over the qualified immunity issue. Yes, Your Honor. And I'd be happy to address that directly. On the qualified immunity issue, again, we think that the Seventh Circuit's analysis in Roe v. Elyea is exactly correct and that on a material – But if we would decline to reach the qualified immunity issue because the district court didn't – That's true, yes. You leave it to the district court. Yes. So the district court could indeed – They could get past that. Yes. So it's not just sending it back for trial. If we were sending it back, we would have the option of sending it back for further proceedings to include assessment of the qualified immunity issue. That's correct, Your Honor. I appreciate the correction. And that would be a victory for you that this qualified immunity has never been addressed. Exactly. Maybe they're entitled to qualified immunity. Maybe the law wasn't clearly established. Thank you, Your Honor. Yes, I agree with that analysis. It might depend on how you frame the issue. That usually has a lot to do with whether somebody gets qualified immunity. Yes. And, again, we think that option is indeed open to this court. Very briefly on a few points – Are you going to go down there and represent him at the trial? I haven't been appointed to do that, Your Honor, and I would have to consult with my firm before I could accept that representation. But you were asked to get in this because he was pro se. Correct, Your Honor. And we decided to get it briefed and argued, and you and your firm took it on. Yes, Your Honor. Thank you. That's certainly true. I would have to consult with my firm before I could accept that representation or before my firm could accept that representation. Very briefly, Your Honor, on a few of the points that the defendants raised. First, on the causation question, they suggest that there's no evidence in the record to show that this policy, in fact, caused the exclusion of treatment here, that caused Gordon to be excluded from treatment. First, Your Honor, as Judge King pointed out, there's the policy itself, which clearly says that an inmate is excluded from treatment if he's parole eligible. Gordon falls within that class, and we think that's evidence from which a jury could infer that the policy did indeed cause his exclusion. Second, they suggest, well, there might be other reasons why he would have been excluded from treatment. But if you look at Joint Appendix 135, 136, and 137, in a grievance that Gordon sets forth that's appealed all the way up to Mr. Schilling, Gordon says repeatedly, I have been denied hepatitis C treatment since 2008 solely because I am eligible for parole once a year. That's at JA 135, 136, and 137. And then at JA 138, Schilling responds, and he doesn't say, no, you were denied treatment because you have some other medical exclusion. You were denied treatment because your doctors don't think this treatment is appropriate for you. He says nothing whatsoever to respond to Gordon's contention that he was denied HCV treatment solely for that reason. And instead, he simply says, quote, there is no violation of policy procedure regarding this issue, end quote. We submit, again, a reasonable jury could infer from that that Gordon was indeed denied treatment solely because he was parole eligible. He didn't have a chance to elaborate further reason that they existed. That's certainly correct. They could have brought forward, either before the district court or before this court, an argument that, in fact, as a matter of fact, his treating doctors thought this was inappropriate for him. All they've done is gesture that possibility, which is enough to raise a jury question. That's enough to get you to a jury trial, but it's not enough to get you summary judgment and preclude a jury trial. Next, Your Honors, the defendant suggests that there was indeed a medical reason for the parole eligibility policy, that because someone might be released on parole, they might not be able to complete the treatment. That argument was raised in Eliea, and the Seventh Circuit rejected it, again, on a materially indistinguishable policy. The reason for that is in the record here. That is because, as the policy itself states, hepatitis C treatment can be completed within 6 to 12 months. It's 6 months if you have genotype 2 or 3. It's 12 months if you have genotype 1 or 4, well within the 2-year window that the policy chose as its exclusion period. In point of fact, Gordon himself had waived parole since 2002. He had waived every single annual parole hearing since 2002. That's in the record at JA 135. In point of fact, and moreover, he waived those parole hearings well in advance of when the parole hearing would actually be held. If you look at JA 79 and 80, it shows that in August 2004, he waived his parole hearing. Then in March 2005, the prison respondent said, we know that you waived your parole hearing. Given the fact that he could have waived those hearings well in advance, there's no reason to believe he couldn't have completed treatment in the assigned time. I see that my time has expired. I'd be happy to respond to any questions. If not, we ask the court to reverse and remand. Well, I think that's it. Thank you, Counsel. Thank you.
judges: Roger L. Gregory, Robert B. King